IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | Criminal No. 23-254 |
| | * | |
| WENDALL SLADE | * | |
| | * | |
| Defendant. | * | Hon. Judge Marilyn J. Horan |

**MOTION TO DISMISS OR STRIKE "SPECIAL FINDINGS" RELATED TO THE ARMED CAREER CRIMINAL ACT, 18 USC § 924(e), FROM THE INDICTMENT**

Wendall Slade moves to dismiss or strike the "Notice of Special Findings" related to the Armed Career Criminal Act, 18 U.S.C. § 924(e), from the indictment, because he is not subject to ACCA or its enhanced penalties as a matter of law. He states:

\*     \*     \*

The indictment in this case includes a "Notice of Special Findings" related to the Armed Career Criminal Act, 18 U.S.C. § 924(e), alleging that Mr. Slade was previously convicted of five "serious drug offenses … committed on occasions different from one another," all of which involved cocaine. The most recent of those convictions is over a decade old—dating back to 2014—and four of the five "offenses" are more than two decades old—dating back to 1992, 2000, and 2001. Nonetheless, the inclusion of those "special findings" now threatens to subject Mr. Slade to a fifteen-year mandatory-minimum sentence and enhanced sentencing guidelines in this case, for his alleged constructive possession of a shotgun in his home.

Fortunately, the stale drug offenses alleged in the indictment fail as ACCA predicates as a matter of law. Pennsylvania law criminalizes cocaine and all of its derivatives, including *all* of its isomers, whether natural or synthetic. But since the Controlled Substances Act was amended by

Congress in 1984, federal law has only criminalized the "optical and geometric isomers" of cocaine. Therefore, applying the categorical approach—which the Supreme Court recently reaffirmed in *Brown* as the method by which to determine whether state offenses count as federal ACCA predicates—each of Mr. Slade's past offenses was, on its face, broader than its federal analogue at the time of his state convictions. As a result, those offenses are not "serious drug offenses" under 18 U.S.C. § 924(e), and ACCA does not apply to Mr. Slade as a matter of law.

For all those reasons, discussed in full below the indictment's "Special Findings" are irrelevant, legally erroneous, and highly prejudicial. Additionally, the indictment contains all of the information about the alleged prior convictions that the Court needs to "determine" whether the government's ACCA allegations fail as a matter of law without a "trial on the merits," Fed. R. Crim. P. 12(b)(1), or whether those allegations should be stricken as legally erroneous and thus irrelevant surplusage. Fed. R. Crim. P. 7(d). Either way, the Court should grant Mr. Slade's motion and dismiss or strike the "Special Findings" related to ACCA from the indictment.

## BACKGROUND

Wendall Slade is a 51-year-old man who was last convicted of a drug felony more than ten years ago, in 2014—based on conduct occurring two years prior, in 2012. Here, he is charged with violating 18 U.S.C. § 922(g)(1), for allegedly constructively possessing a shotgun in his home. The government claims that he is subject to ACCA's enhanced, draconian penalties for that offense based on several decade- and two-decade-old drug convictions, the relevant details of which are as follows:

(1)   On May 12, 1993, he was allegedly convicted of possession with intent to deliver cocaine in case number CP-02-12134-1992 in the Allegheny County Court of Common Pleas, which related to conduct occurring on or about June 26, 1992. Each count alleged possession with

intent to deliver "0.5 grams of cocaine." *See* Criminal Complaint & Information in CP-02-12134-1992 (attached as **Exhibit A**).

(2) On February 20, 2002, he was allegedly convicted of possession with intent to deliver cocaine in case number CP-02-CR-04553-2001 in the Allegheny County Court of Common Pleas, which related to conduct occurring around August 30, 2000 (Counts One and Two) and September 14, 2000 (Counts Four and Five). *See* Criminal Information in CP-02-04553-2001 (attached as **Exhibit B**).

(3) On March 21, 2002, he was allegedly convicted of possession with intent to deliver cocaine, at Counts Two and Three of case number CP-65-CR-02168-2001 in the Westmoreland County Court of Common Pleas, which related to conduct occurring around February 28, 2001. *See* Criminal Information in CP-65-CR-02168-2001 (attached as **Exhibit C**).

(4) On February 13, 2013, he was allegedly convicted of possession with intent to deliver cocaine, at Counts One and Three of case number CP-02-CR-02286-2013 in the Allegheny County Court of Common Pleas, which related to conduct occurring around November 5, 2012. *See* Criminal Information in CP-02-CR-02286-2013 (attached as **Exhibit D**).

The government alleges that these four convictions constitute five "serious drug offenses … that were committed on occasions different from one another," ECF 3 at 3-4, triggering the enhanced penalties of 18 U.S.C. 924(e). Mr. Slade disagrees.

**ARGUMENT**

The Armed Career Criminal Act, codified in 18 U.S.C. § 924(e), provides that any person who violates a provision of 18 U.S.C. § 922(g) and has "three previous convictions by any court … for a violent felony or a serious drug offense, or both, committed on occasions different from one another," shall be "imprisoned not less than fifteen years." 18 U.S.C. § 924(e). "ACCA defines 'serious drug offense' as offenses listed in the Controlled Substances Act, Pub. L. No. 91-513, 84 Stat. 1242 (1970), and as state offenses involving substances on the Federal Schedules of Controlled Substances, 21 U.S.C. § 802, that carry a term of imprisonment of ten years or more." *United States v. Brown*, 47 F.4th 147, 149 (3d Cir. 2022), *aff'd*, 602 U.S. 101 (2024). Mr. Slade's old state drug convictions don't fit that bill.

**I.     The Court must use the "categorical approach" to determine whether Mr. Slade's alleged convictions are "serious drug offenses" under ACCA.**

"A state drug offense counts as an ACCA predicate only if the State's definition of the drug in question 'matches' the definition under federal law." *Brown v. United States*, 602 U.S. 101, 106 (2024) (cleaned up). To determine whether the state's definition of a drug is a match for the corresponding federal definition, the Court applies a "categorical approach," under which it looks "only to the statutory definitions" of the controlled substance at-issue under state and federal law, and not to "the particular facts underlying the prior convictions." *Shular v. United States*, 589 U.S. 154, 157 (2020) (citing *Taylor v. United States*, 495 U.S. 575, 600 (1990); *Mathis v. United States*, 579 U.S. 500, 509-10 (2016)); *see also Mathis*, 579 U.S. at 513 ("ACCA, as just explained, treats such facts as irrelevant: Find them or not, by examining the record or anything else, a court still may not use them to enhance a sentence.").

What that means is this: If a state drug schedule encompasses controlled substances that are not included in the federal drug schedules, then the state offense is categorically overbroad and does not qualify as a "serious drug offense." *See Brown*, 47 F.4th 147, 149-50 (considering whether state statute, which criminalized all forms of the cannabis plant, was a match for federal statute, which removed hemp from the Controlled Substances Act); *United States v. Owen*, 51 F.4th 292, 295 (8th Cir. 2022) ("The question for us is whether Minnesota's definition of cocaine sweeps more broadly than the one in the federal controlled-substance schedules."). Indeed, if the state drug statute "criminalizes ***even one additional isomer***" of a controlled substance that the federal Controlled Substances Act does not, it is not a "serious drug offense" for purposes of ACCA. *Owen*, 51 F.4th at 269 (emphasis added); *United States v. Minter*, 80 F.4th 406, 409 (2d Cir. 2023) ("A state's criminalization of a single substance not also prohibited by the CSA is often enough to

- 4 -

prevent a prior conviction from triggering a federal sentencing enhancement."); *see, e.g., United States v. De La Torre,* 940 F.3d 938, 951 (7th Cir. 2019) ("Because the federal definition of methamphetamine includes only its optical isomers whereas the Indiana definition includes something more than just optical isomers of methamphetamine, the mismatch renders the Indiana statute overbroad."); *United States v. Espy*, No. 2:18-332, 2022 WL 247833, at *3 (W.D. Pa. Jan. 27, 2022) (Horan, J.) ("The federal definition of heroin includes heroin and its optical isomers only. Pennsylvania's definition of heroin, however, includes heroin and its salts, isomers, and salts of isomers; which necessarily includes non-optical isomers not covered under federal law. Therefore, on its face, the Pennsylvania definition of heroin covers a wider range of conduct than the federal definition.").

In making that comparison, the Court looks to whether "the drugs on the federal and state schedules matched" at the time "when the state drug offense was committed." *Brown*, 144 S. Ct. at 1208.

II.  **Pennsylvania cocaine offenses are not "serious drug offenses" under ACCA, because they are categorically broader than their federal counterparts.**

   A.  **Pennsylvania criminalizes every "derivative" of cocaine, a broad category which includes all of cocaine's "isomers."**

Isomers are chemical molecules that share a molecular formula—*i.e.,* contain the same number of atoms of each constituent element—but differ in how those atoms are arranged in space. *See* Ernest L. Eliel *et al.*, *Stereochemistry of Organic Compounds* 1021 (1994). They are, in other words, reorganized versions of otherwise identical molecules. In general, "[t]here are two broad types of isomers: stereoisomers—isomers in which the atoms are joined in the same order, but in a different spatial arrangement—and constitutional isomers, which are all other isomers, including

what are termed 'positional isomers.'" *Minter*, 80 F.4th at 410. "Optical and geometric isomers, which are mentioned in the DEA's definition of 'isomer,' are sub-types of stereoisomers. Positional isomers—also noted in the DEA's definition of 'isomer'—are a sub-type of constitutional isomers." *United States v. Phifer*, 909 F.3d 372, 377 (11th Cir. 2018).

"Cocaine has multiple isomers." *Owen*, 51 F.4th at 295. Pennsylvania criminalizes all of them. Specifically, Pennsylvania's drug schedule defines cocaine-related controlled substances as follows:

> (i) Any of the following substances, of any quantity, except those narcotics specifically excepted or listed in other schedules, whether produced directly or indirectly by extraction from substances of vegetable origin, or independently by means of chemical synthesis, or by combination of extraction and chemical synthesis:
>
> …
>
> 1. Coca leaves and any salt, compound, **derivative**, or preparation of coca leaves, and any salt, compound, **derivative**, or preparation thereof which is chemically equivalent or identical with any of these substances, but shall not include decocainized coca leaves or extracts of coca leaves, which extracts do not contain cocaine or ecgonine.

35 P.S. § 780-104(2)(i)(4) (emphasis added).

The term "derivative" is broad. In chemistry, it means "a chemical substance related structurally to another substance and theoretically derivable from it" or "a substance that can be made from another substance." DERIVATIVE, MERRIAM-WEBSTER DICTIONARY, at definition 4, chemistry (available at link). Thus, by its plain meaning, Pennsylvania's definition of the cocaine family of substances broadly includes all substances related structurally to the coca leaf and "theoretically derivable from it," as well as all "substances that can be made from" the coca leaf, whether by natural extraction or chemical synthesis. *Id.*

In *Commonwealth v. Slyman,* the Pennsylvania Superior Court confirmed that the Pennsylvania drug statute's language was "intended to prohibit *all* varieties of cocaine," including those "derived directly from coca leaves as well as th[ose] synthetically produced in the laboratory…" *Commonwealth v. Slyman*, 483 A.2d 519, 524-25 (Pa. Super. 1984). There, the Court "rejected in its entirety" the defendant's theory that Pennsylvania law "only prohibits *those isomers of cocaine* which are the natural product of the coca leaf and their chemical equivalents." *Id.* at 528 (emphasis added). Instead, the Court concluded, the Pennsylvania statute's broad language prohibited *all* "isomers" of cocaine, including those "varieties … which are susceptible of synthetic derivation." *Id.; see also United States v. Bell*, 2024 WL 1892283, *8-*9 (M. D. Pa., April 30, 2024) (discussing *Slyman* and gleaning from it the "general principle that, where [Pennsylvania's drug schedule] controls *all* isomeric forms of a particular substance, the Commonwealth need not prove that the substance possessed was a particular one of those isomers to sustain a conviction.").[1]

In sum, Pennsylvania's drug statute does not otherwise include a definition of the term "isomer" or place any limit on the *type* of isomers included in its definition of cocaine or cocaine derivatives. Rather, it broadly sweeps in "*all* varieties of cocaine," including "those isomers of cocaine" which are "synthetically produced in the laboratory[.]" *Slyman*, 483 A.2d at 524-25, 528.

---

[1]  The *Slyman* Court even acknowledged in a footnote that it was aware it was likely interpreting Pennsylvania's definition of cocaine more broadly than its federal counterpart at the time. *See Slyman*, 483 A.2d at 528 n.16 ("We acknowledge that the positions we take today … are at odds with those adopted by certain federal circuit courts which … have ruled that cocaine will constitute a Schedule II controlled substance only so long as it is capable of derivation from coca leaves. … [W]e are in no way bound by these [federal] cases and are free to reject their holdings, particularly where, as here, the federal position remains ambiguous.").

And cocaine not only has optical and geometric isomers, but positional isomers too, which can be derived synthetically. *See United States v. Ruth*, 966 F.3d 642, 648 (7th Cir. 2020) ("Agent Casale does not actually aver that positional isomers of cocaine do not exist. … It is not the province of the judiciary to rewrite Illinois's statute to conform to a supposed practical understanding of the drug trade."); *see also* F. Ivy Carroll *et al.*, *Cocaine Receptor: Biochemical Characterization and Structure-Activity Relationships of Cocaine Analogues at the Dopamine Transporter*, 35 J. OF MEDICINAL CHEMISTRY 969, 969 (1992).

Further illustrating the overbreadth of Pennsylvania's definition of cocaine, there is clear evidence that the Pennsylvania legislature knew how to limit the sweep of its statutes to specific types of isomers when it intended to do so. *See, e.g.*, 35 P.S. 780-104(2)(iii)(1) (1972) (listing "Amphetamine, its salts, optical isomers, and salts of its optical isomers"). "[W]hen the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 712 n.9 (2004). Here, there is no basis to assume that Pennsylvania law criminalizes only certain types of cocaine's isomers when the legislature has done so elsewhere and did not do so here. Rather, as *Slyman* held, it criminalizes all of them.

**B.    Federal law criminalizes only "optical" and "geometric" isomers of cocaine.**

Meanwhile, unlike Pennsylvania law, federal law criminalizes only *some* of cocaine's isomers. In 1984, Congress amended the federal Controlled Substances Act to expand its reach, while preserving certain limits. See H.R. Rpt. 98-835 (June 12, 1984). Since those amendments, "[c]ocaine" is now defined in Schedule II of the drug tables to reach only "optical and geometric isomers" of cocaine:

> (4) coca leaves, except coca leaves and extracts of coca leaves from which cocaine, ecgonine, and derivatives of ecgonine or their salts have been removed; cocaine, its salts, **optical and geometric isomers**, and salts of isomers; ecgonine, its derivatives, their salts, isomers, and salts of isomers; or any compound, mixture, or preparation which contains any quantity of any of the substances referred to in this paragraph.

21 U.S.C. § 812, Sch. II(a)(4).

That limitation is underscored by the federal definition of "isomer," which includes only the "optical or geometric" isomers in the case of cocaine, but extends to the "optical, *positional*, [and] geometric" isomers of other controlled substances, such as hallucinogens. 21 U.S.C. § 802(14); *see also* 21 C.F.R. § 1300.01(b); 21 C.F.R. § 1308.11(d) (defining hallucinogens to include its "optical, *positional*, or geometric" isomers (emphasis added)); *see also Minter,* 80 F.4th at 410 ("The CSA includes only stereoisomers—optical and geometric—in its definition of cocaine, but includes certain constitutional isomers in its definitions of other drugs.").

That omission cannot be attributed to Congressional or scientific ignorance. Constitutional and "positional" isomers of cocaine were known to exist when the Controlled Substances Act was amended and when *Slyman* correctly interpreted Pennsylvania's broad law to cover all of cocaine's "isomers," whether natural or synthetic. *See Minter*, 80 F.4th at 412 ("Constitutional isomers were known to exist when the New York Legislature added the term 'isomers' to the definition of cocaine in 1978." (cleaned up)); *see also United States v. Holmes*, 2022 WL 1036631, *8 (E.D.N.Y. 2022) (citing Robert L. Clarke & Sol J. Daum, *β-Cocaine*, 18 J. OF MEDICINAL CHEMISTRY 102, 102-103 (1975) to support conclusion that positional isomers of cocaine were known to exist in 1975). Despite that, Congress defined cocaine to sweep in only its "optical" and "geometric" isomers of cocaine in the Controlled Substances Act, while specifying that the statute extended to the "positional" isomers of other substances.

Accordingly, the federal definition of cocaine, which criminalizes only its "optical" and "geometric" isomers, is facially narrower than Pennsylvania's definition, which broadly criminalizes cocaine and all conceivable isomers, whether optical, geometric, or positional.

**C.    Multiple courts of appeals have now recognized that state laws which criminalize all isomers of cocaine (or do not define "isomer") are broader than federal law's criminalization of cocaine's "optical" and "geometric" isomers.**

The Third Circuit has not yet had occasion to consider or apply the above analysis to Pennsylvania's drug law. But multiple other courts of appeals have recently done so, and they have concluded that state laws which criminalize *all* isomers of cocaine (or do not define the term "isomer") are categorically broader than federal law, which criminalizes only "optical" and "geometric" isomers of cocaine. For example:

In *Minter*, the Second Circuit held that New York's statute defining cocaine generally to include "isomers," without defining that term, swept more broadly than the federal definition, because it did not "limit itself to optical or geometric isomers." *Minter*, 80 F.4th at 410. "[T]he New York statute applies on its face to all cocaine isomers," the court explained, while "the CSA does not." *Id.* at 413. "Given the plain text and purpose of the New York statute," the court held that it could not "rewrite the law to conform it to what the government contends is a realistic picture of actual cocaine prosecutions." *Id.*

In *Owen*, the Eighth Circuit held that Minnesota's definition of cocaine was broader than its federal counterpart because it criminalized all of cocaine's "isomers." *Owen*, 51 F.4th at 295. "The problem for the government," the court explained, "is that federal law criminalizes just two: optical and geometric isomers." *Id.* "Minnesota's statute, by contrast, bans them all." *Id.* at 295-96. In *Myers*, the Eighth Circuit reached the same conclusion with respect to Missouri's definition of cocaine, which also extended to all such "isomers." *United States v. Myers*, 56 F.4th 595 (8th

Cir. 2022). "Given the unambiguous breadth of Missouri's definition of cocaine," the court wrote, "we agree with the district court that Myers's prior Missouri conviction for the sale of cocaine was not a predicate offense for purposes of the ACCA." *Id.*

Finally, in *Ruth*, the Seventh Circuit held that Illinois' definition of cocaine, which included "optical, positional, and geometric isomers," was "categorically broader than the federal definition," which included "only its 'optical and geometric isomers.'" *Ruth*, 966 F.3d at 647. "[T]he government offers theoretical challenges to positional isomers of cocaine," the court explained, "but cannot avoid the inescapable conclusion that the plain language of the state statute categorically covers a larger swath of conduct than its federal counterpart." *Id.* at 648; *see also De La Torre*, 940 F.3d at 951 ("According to Rush, then, Indiana's generic use of 'isomer' in relation to methamphetamine must be broader than optical isomers. We agree. Because the federal definition of methamphetamine includes only its optical isomers whereas the Indiana definition includes something more than just optical isomers of methamphetamine, the mismatch renders the Indiana statute overbroad.").

This Court should reach the same result with respect to Pennsylvania's broad statute here. A textual reading of the Pennsylvania and federal statutes illustrates that Pennsylvania's definition of cocaine, both on its face and as interpreted by state authority, is categorically broader than the corresponding federal definition. That is, the federal Controlled Substances Act criminalizes only optical and geometric isomers of cocaine, while Pennsylvania criminalizes *all* cocaine isomers, including its positional isomers. Because of this categorical mismatch, Mr. Slade's decades-old prior drug convictions cannot serve as predicate "serious drug offenses" to trigger ACCA's 15-year mandatory-minimum.

### III. The Court should dismiss or strike the erroneous ACCA findings from the indictment because they are irrelevant, prejudicial, and will require an unnecessary jury trial related to ACCA's "occasions clause" even though the alleged predicate convictions are not "serious drug offenses" as a matter of law.

That leaves just one question—whether the Court should address Mr. Slade's challenge to the government's ACCA allegations now or leave the question for a theoretical sentencing if he is later convicted of violating 18 U.S.C. § 922(g)(1) at trial. Before the Supreme Court's decision in *Erlinger*, some courts held that ACCA was properly addressed at sentencing, since it operated as a sentencing enhancement. After *Erlinger*, that no longer makes sense.

In *Erlinger*, the Supreme Court held that the Fifth and Sixth Amendments require a unanimous jury to determine, beyond a reasonable doubt, whether a defendants alleged ACCA predicate offenses were "committed on separate occasions." *Erlinger v. United States*, 602 U.S. 821, 825 (2024). That inquiry requires a jury to weigh a "range" of" facts "including whether the defendant's past offenses were 'committed close in time,' whether they were committed near to or far from one another, and whether the offenses were 'similar or intertwined' in purpose and character." *Id.* at 828. "And given the intensely factual nature of this inquiry and the impact its resolution can have on a defendant's sentence … a jury must resolve it," a holding compelled by the Fifth and Sixth Amendment's "guarantee" of "the right to have a unanimous jury find beyond a reasonable doubt any fact that increases [a defendant's] exposure to punishment." *Id.*

Given that, the Court should not defer the determination of whether to dismiss or strike the "Special Findings" related to ACCA that the government now, after *Wooden* and *Erlinger*, presents to a grand jury, pleads in an indictment, and must prove beyond a reasonable doubt to the petit jury at trial. In other words, if Mr. Slade's convictions *were* otherwise "serious drug offenses," he would be entitled to a jury trial on whether those offenses occurred on different

"occasions." And there is reason in this case to seriously question whether they did—two of his alleged ACCA predicates stem from a single case charging extremely similar conduct occurring close in time, and a third was charged in a separate case involving similar conduct arising a few months after that. If a jury does not find beyond a reasonable doubt that those offenses occurred on separate "occasions," ACCA does not apply to Mr. Slade for that reason as well. But there is no reason to empanel a jury and expend significant judicial resources on a trial of that issue in the first place, when *none* of the convictions pled by the government in the indictment are valid "serious drug offenses" under ACCA at all.

Under Federal Rule of Criminal Procedure 12(b)(1), "[a] party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." Fed. R. Crim. P. 12(b)(1). Such motions include, but are not limited to, challenges to "a defect in the indictment or information" or to the indictment's "failure to state an offense." Additionally, under Federal Rule of Criminal Procedure 7(d), this Court retains broad discretion to "strike language from an indictment" when "the allegations contained in the indictment are not relevant to the charge made or contain inflammatory and prejudicial matter." *United States v. Johnson*, 256 F. Supp. 3d 755, 759 (M.D. Tenn. 2017); Fed. R. Crim. P. 7(d) ("Upon the defendant's motion, the court may strike surplusage from the indictment or information."). "The court's decision on a Rule 7(d) motion turns on considerations of relevance and prejudice." *United States v. O'Connor*, 656 F.3d 630, 645 (7th Cir. 2011).

In *Erlinger's* wake, it is now even less sensible than it was before to defer until sentencing any ruling on whether the ACCA predicates alleged by the government fail as a matter of law. Such findings are now made by a grand jury and pled in the indictment itself—and the government is

committed to proving the specific ACCA predicates it has chosen to plead in the indictment at trial. Thus, there is no longer any pre-trial uncertainty about what offenses the government intends to rely on as ACCA predicates. Plus, if the Court does not resolve a challenge to the sufficiency of such allegations as a matter of law pre-trial, the result will be an unnecessary "trial on the merits," Fed. R. Crim. P. 12(b)(1), related to "occasions clause" issues. There is simply no reason to require a jury to engage in the "intensely factual" inquiry of whether at least three of Mr. Slade's predicate offenses pled by the government here occurred on different "occasions," *Erlinger*, 602 U.S. at 825, when the Court now has all of the information it needs in the indictment to readily "determine," without a "trial on the merits," that his alleged convictions are not "serious drug offenses" under ACCA at all. Fed. R. Crim. P. 12(b)(1).

Additionally, Mr. Slade cannot make a voluntary and intelligent decision about whether to proceed to trial without knowing whether his prior convictions qualify him for ACCA's 15-year mandatory minimum sentence. *See Brady v. United States*, 397 U.S. 742, 748 (1970) (holding that a guilty plea is "a waiver of [the] right to trial before a jury" and that "[w]aivers of constitutional rights not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences"); Fed. R. Crim. P. 11(b)(1)(H), (I) (requiring the court, before accepting a guilty plea, to confirm that the defendant understands the possible minimum and maximum penalties). If it applied to him, ACCA would increase Mr. Slade's statutory sentencing range from zero-to-15 years to 15-years-to-life, and also dramatically increase his advisory sentencing guidelines to boot. Under those circumstances, he cannot possibly determine whether to plead or proceed to trial without having the slightest clue as to which sentencing range he is subject, or whether he will need to request a jury trial under the "occasions

clause" to challenge his ACCA status on other grounds (he would not need to if the ACCA predicates pled by the government are not, in fact, "serious drug offenses.").

Finally, because ACCA does not apply to Mr. Slade as a matter of law, presenting "special" allegations in an indictment alleging him to be an "Armed Career Criminal" to the jury, and listing his prior convictions for alleged "serious drug offenses" therein, would be legally irrelevant and highly prejudicial to his trial on the § 922(g) count—given that ACCA does not apply to him as a matter of law. Thus, the ACCA "Special Findings" are legally irrelevant and prejudicial surplusage that can properly be stricken under Rule 7(d) as well.

In sum, following *Erlinger*—and especially given that a *bona fide* issue under ACCA's "occasions clause" also exists in this case—the Court should rule now on Mr. Slade's motion and dismiss or strike the legally deficient "Special Findings" related to ACCA from the indictment, whether under Fed. R. Crim. P. 12(b)(1), 7(d), or both.

*    *    *

For all the reasons discussed above, Mr. Slade is not subject to ACCA's draconian penalties, because his drug offenses from decades prior are not "serious drug offenses" within the meaning of 18 U.S.C. § 924(e). Furthermore, the Court can readily make that determination from the information pled in the indictment, without resolving any factual disputes or holding a trial on the merits of other issues. Fed. R. Crim. P. 12(b)(1). The Court should grant Mr. Slade's motion and dismiss or strike the "Notice of Special Findings" from the indictment in this case.

- 16 -

                Respectfully submitted:

                /s/ Jake Morrison
                JAKE MORRISON
                Assistant Federal Public Defender
                PA ID No. 322552